665 S.E.2d 284

**Jeffrey A. HORKULIC, Rebecca A. Horkulic, His Wife, and Jeffrey Horkulic, as Natural Parent and Legal Guardian of Stephanie Horkulic and Benjamin Horkulic, Minors, Plaintiffs Below, Appellees**

v.

**William O. GALLOWAY, Galloway Law Offices, Cambridge Professional Liability Services, and Acordia of West Virginia, Inc., and John Does Unknown, Defendants Below,**

and

**TIG Insurance Company, Defendant Below, Appellant.**

**TIG Insurance Company, Petitioner**

v.

**The Honorable Arthur M. Recht; William O. Galloway, Galloway Law Offices; Cambridge Professional Liability Services and John Does Unknown; Jeffrey A. Horkulic; Rebecca A. Horkulic, his Wife, and Jeffrey Horkulic, as Natural Parent and Legal Guardian of Stephanie Horkulic and Benjamin Horkulic, Minors, Respondents.**

Nos. 33352, 33353.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 8, 2008.

Decided Feb. 19, 2008.

Concurring Opinion of Justice Davis Feb. 21, 2008.

Thomas V. Flaherty, Tammy R. Harvey, Jaclyn A. Brÿk, Flaherty, Sensabaugh & Bonasso, PLLC, Charleston, for the Appellant.

Joseph W. Selep, Zimmer Kunz, PLLC, Pittsburgh, PA, for the Appellees, William O. Galloway and Galloway Law Offices.

Robert P. Fitzsimmons, Robert J. Fitzsimmons, Fitzsimmons Law Offices, Wheeling, and Dean G. Makricostas, David N. Dittmar, Daniel P. Taylor, Dittmar Taylor & Makricosts, PLLC, Weirton, for Appellees, Jeffrey A. Horkulic; Rebecca A. Horkulic, his wife, and Jeffrey Horkulic, as Parent and Natural Guardian of Stephanie Horkulic and Benjamin Horkulic, Minors.

ALBRIGHT, Justice:

This matter is before this Court upon an appeal by TIG Insurance Company (hereinafter "Appellant" or "TIG") from an August 25, 2006, order of the Circuit Court of Hancock County granting a Motion to Compel Enforcement of Compromise Settlement Agreement filed by the Appellees, Jeffrey Horkulic, Rebecca Horkulic, and Jeffrey Horkulic as natural parent and legal guardian of Stephanie Horkulic and Benjamin Horkulic (hereinafter "Appellees" or "Horkulics"). TIG also requests a writ of prohibition from an order

of the lower court assessing an award of attorney fees against TIG.

On appeal of the order compelling enforcement of a settlement agreement, TIG maintains that the lower court's failure to permit TIG to participate in the May 30, 2006, plenary hearing on the motion to compel constitutes a violation of TIG's due process rights and should prevent TIG from being bound by the ultimate holdings of the lower court to the extent that such holdings may ultimately affect TIG's rights in the pending bad faith claim against TIG. The petition for a writ of prohibition, filed by TIG, seeks to prevent the lower court from enforcing an order requiring TIG to pay attorney fees associated with the litigation of the Appellees' motion to compel.

Upon thorough review of the arguments of counsel, briefs, record, and applicable precedent, this Court consolidates the appeal and the request for a writ of prohibition and affirms the determination of the lower court that the parties entered into a valid and enforceable settlement agreement. We also grant the requested writ of prohibition, as moulded, on the issue of attorney fees, and remand this matter for relitigation of the issue of the Horkulics' entitlement to attorney fees.

### I. Factual and Procedural History

This matter was initially presented as a legal malpractice action filed by the Appellees against their former attorney, Mr. William O. Galloway and Galloway Law Offices. The original complaint alleged that Mr. Galloway committed legal malpractice by failing to observe a statute of limitations applicable to the Appellees' automobile accident claims.[1] Mr. Galloway was insured through a lawyers professional liability policy issued by the Appellant, TIG, with liability limits of $500,000.00. TIG undertook the defense of Mr. Galloway in the underlying legal mal-

practice action and hired attorney William D. Wilmoth to defend Mr. Galloway. Mr. Galloway also continued to retain his own private attorney, Jason Cuomo.

On October 27, 2003, the Appellees amended their complaint to assert a third-party bad faith claim against TIG, Cambridge Professional Liability Services, and Acordia of West Virginia. The bad faith claim was bifurcated, and discovery against TIG and Cambridge was stayed, pending the outcome of the legal malpractice action against Mr. Galloway.

On May 4, 2005, Mr. Wilmoth, as counsel for Mr. Galloway, discussed settlement potentials with counsel for the Appellees, Mr. Robert P. Fitzsimmons. Mr. Mark S. Rapponotti, Senior Claims Analyst for TIG, was also involved in a telephone conversation between Mr. Wilmoth and Mr. Fitzsimmons. TIG asserts that settlement authority of $250,000.00 had been extended by Mr. Rapponotti to Mr. Wilmoth at the time of those initial conversations.[2] The settlement proposal allegedly selected by the parties included the following pertinent provisions: TIG would pay policy limits of $500,000.00, minus costs; Mr. Galloway would confess judgment in the amount of $1.5 million; TIG would consent to the judgment order and the confessed judgment; the Horkulics would agree not to execute against Mr. Galloway and would not record the judgment; a dismissal order would be entered in favor of Mr. Galloway; and the Horkulics would receive one-third of any recovery Mr. Galloway would have against TIG or Cambridge.

 Mr. Rapponotti, of TIG, thereafter extended Mr. Wilmoth's authority to settle the legal malpractice portion of the case for $500,000.00. However, Mr. Rapponotti specifically declined to consent to a confessed

---

1. The automobile accident occurred on November 19, 1999, and the legal services of Mr. Galloway were terminated by the Horkulics on January 30, 2002, after the statute of limitations had expired. The alleged tortfeasor in the underlying automobile accident has a liability policy with limits of $100,000.00. Mr. Horkulic allegedly sustained medical bills of approximately $30,000.00 and lost wages of $4,022.49. Mrs.

Horkulic allegedly sustained medical bills of $256.00.

2. The record reflects that two alternatives for settlement were initially discussed. One alternative, not selected by the parties, would have required the defendants to pay the Horkulics $1,000,000.00 in cash in exchange for a release and dismissal order.

judgment of $1.5 million by Mr. Galloway.[3] Additional correspondence from TIG continued to assert TIG's objection to any confessed judgment by Mr. Galloway as a portion of the settlement agreement. TIG did, however, agree to pay policy limits of $500,000.00. Mr. Wilmoth and Mr. Fitzsimmons maintain that they entered into a settlement agreement on May 9, 2005, with the understanding that TIG would not consent to the portion of the settlement in which Mr. Galloway confessed judgment in the amount of $1.5 million.[4] Further, according to the settlement agreement, Mr. Galloway would waive all attorney-client privileges which he was entitled to raise with regard to documents and records.

Throughout the ensuing months, Mr. Fitzsimmons repeatedly contacted Mr. Wilmoth to ascertain the status of the settlement payment. The primary disagreement among the parties was apparently the inclusion of the confessed judgment for $1.5 million by Mr. Galloway. On August 10, 2005, "the Horkulics filed a Motion to Compel Enforcement of Compromised Settlement Agreement." In an August 18, 2005, conference call among attorneys for the parties, TIG reiterated that it had agreed to pay the policy limits of $500,000.00 on the claim but would not consent to the entry of a confessed judgment of $1.5 million by Mr. Galloway. The right of TIG to file an objection to the confession of judgment was discussed during that conference call.[5]

On May 30, 2006, the lower court held a plenary hearing on the Horkulics' motion to compel. TIG was not permitted to participate in the hearing, despite the fact that

---

3. Mr. Galloway's policy with TIG requires consent of TIG to any settlement, as well as consent of the insured for settlement of the claim.

4. The record reflects that counsel for the Horkulics, Mr. Fitzsimmons, originally sought TIG's approval of the $1.5 million confessed judgment. However, Mr. Fitzsimmons and Mr. Wilmoth allege that it was eventually agreed that the confessed judgment would be included, with specific reference to TIG's right to file objections. According to Mr. Wilmoth, as well as documents filed by the Horkulics, this resolution was confirmed in a conversation between Mr. Wilmoth and TIG's representative, Mr. Rapponotti. Mr. Wilmoth also contacted Mr. Galloway to discuss the resolution and learned that Mr. Galloway consented to the entire agreement.

The record also reveals some degree of confusion regarding the status of Mr. Galloway's consent to the proposed settlement agreement throughout the negotiations. It appears that Mr. Galloway's principal consideration was the protection of his own personal assets. Thus, before Mr. Galloway learned that TIG would object to portions of the settlement agreement and had written a reservation of rights letter in August 2005, Mr. Galloway apparently consented to the settlement without hesitation. In a September 29, 2005, letter, Mr. Wilmoth communicated Mr. Galloway's consent to settlement. The issue of Mr. Galloway's consent was also discussed in a December 9, 2005, hearing before the lower court. During that hearing, Mr. Galloway's personal counsel, Jason Cuomo, indicated that it was his understanding that Mr. Galloway had not consented to the settlement. However, in a December 20, 2005, letter from Mr. Wilmoth to Mr. Rapponotti, Mr. Wilmoth reiterated Mr. Galloway's "position that the settlement negotiated on his behalf, which would have resolved the malpractice claim against him within his policy limits, and without the possibility of Plaintiffs', or any other entity's for that matter, reaching his personal assets, should go forward immediately." By the time of the May 30, 2006, hearing, Mr. Wilmoth testified that Mr. Galloway had specifically consented to the settlement.

The lower court found that Mr. Wilmoth had authority to speak on behalf of Mr. Galloway. With regard to attorney authority, this Court's decisions have consistently held as follows: "When an attorney appears in court representing clients there is a strong presumption of his authority to represent such clients, and the burden is upon the party denying the authority to clearly show the want of authority." Syl. Pt. 1, *Miranosky v. Parson*, 152 W.Va. 241, 161 S.E.2d 665 (1968). Moreover, any questions regarding Mr. Wilmoth's authority to address Mr. Galloway's consent should have been raised formally in the lower court, if at all. As syllabus point two of *Miranosky* instructs, "The question of the attorney's want of authority to represent clients must be raised immediately by a motion or petition accompanied by affidavits."

5. The August 18, 2005, conference call was apparently initiated by TIG's attorneys, including Beth Berger Zerman, Ed Ruberry, and Thomas Flaherty. Mr. Fitzsimmons, as counsel for the Horkulics, was later joined in the conference call. Mr. Wilmoth testified that it was again agreed that Mr. Galloway would file a confessed judgment of liability and damages of $1.5 million and that TIG could then file its objection. By letter dated September 1, 2005, Mr. Fitzsimmons wrote to Mr. Wilmoth, confirming the agreement. Mr. Wilmoth responded on September 29, 2005, indicating that Mr. Fitzsimmons' perception of the agreement was correct.

attorneys for TIG had notice of the hearing and were present in the room during the hearing. Attorney William Wilmoth was the only witness called by the parties. The Horkulics also introduced seventeen exhibits, as evidence of the various correspondence regarding settlement discussions. Mr. Galloway's personal attorney, Mr. Cuomo, did not present any witnesses at the hearing. On August 25, 2006, the lower court entered an order granting the Horkulics' motion to compel the enforcement of the settlement agreement. That order specifically recognized TIG's right to object to the admissibility of the confessed judgment, as follows: "ORDERED that defendants [including TIG] shall be entitled to object to the admissibility into evidence of the confessed judgment portion of the settlement during the Unfair Claims Settlement Practices Act claim ... which and [sic] been previously stayed and bifurcated."

On appeal to this Court, TIG contends that the lower court improperly included language in the order indicating that TIG had granted broad authority to enter into the settlement. Further, TIG maintains that the lower court erred in entering findings of fact and conclusions of law against TIG that are central to the issues which will be subsequently addressed in the separate litigation of the bad faith claims asserted by the Horkulics. TIG also contends that the lower court erroneously permitted the inclusion of Mr. Galloway's motion for injunctive relief on the issue of protection of his personal assets; that the court erred in permitting waiver of Mr. Galloway's attorney-client privileges; and that the court permitted hearsay testimony by Mr. Wilmoth with regard to settlement negotiations. In the request for a writ of prohibition, TIG also alleges that the lower court erroneously awarded attorney fees to by paid by TIG and that the attorney fees were excessive.

## II. Standard of Review

■ In this Court's review of a decision of a circuit court, a three-part standard of review has consistently been applied, as expressed in syllabus point two of *Walker v. West Virginia Ethics Commission,* 201 W.Va. 108, 492 S.E.2d 167 (1997):

In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

■ With specific regard to the requested writ of prohibition, West Virginia Code § 53–1–1 (1923) (Repl.Vol.2000) provides that "[t]he writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." This Court has been "restrictive in the use of prohibition as a remedy." *State ex rel. West Virginia Fire & Casualty Co. v. Karl,* 199 W.Va. 678, 683, 487 S.E.2d 336, 341 (1997). This Court has held that "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for ... [a petition for appeal] or certiorari." Syl. Pt. 1, *Crawford v. Taylor,* 138 W.Va. 207, 75 S.E.2d 370 (1953). This court also held as follows syllabus point four of *State ex rel. Hoover v. Berger,* 199 W.Va. 12, 483 S.E.2d 12 (1996):

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impres-

sion. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

With the applicable standards of review as guidance, we address the matters presented in this case.

### III. Discussion

### A. Binding Nature of the Order in the Subsequent Bad Faith Action

■ This Court has consistently held that a circuit court has the authority to enforce a settlement agreement through a party's motion to compel enforcement. As this Court found in *Moreland v. Suttmiller*, 183 W.Va. 621, 397 S.E.2d 910 (1990), where the underlying record provides sufficient evidence of intent to enter into settlement agreements and authorization to attorneys to do so, a court's decision to enforce the agreement will not be overturned. The *Moreland* Court explained as follows: "On the whole, we believe that the evidence shows that settlement agreements were culminated between the appellants and both appellees. We base our conclusion in part on the Morelands' written and oral communications with their counsel and the court." *Id.* at 625, 397 S.E.2d at 914.

■ Evidence indicating the culmination of settlement negotiations was also addressed by this Court in *F.S. & P. Coal Co. v. Inter-Mountain Coals, Inc.*, 179 W.Va. 190, 366 S.E.2d 638 (1988). In F.S. & P., this Court found "no evidence in the record to contradict the circuit court's ruling that the compromise and settlement agreement entered into by the parties was a valid and binding contract of settlement." 179 W.Va. at 192, 366 S.E.2d at 640. As a guiding axiom, this Court has held that "[t]he law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." Syl. Pt. 1, *Sanders v. Roselawn Memorial Gar-*

*dens, Inc.*, 152 W.Va. 91, 159 S.E.2d 784 (1968); *see also Board of Educ. of Monongalia County v. Starcher*, 176 W.Va. 388, 343 S.E.2d 673 (1986); *Daily Gazette Co., Inc. v. Canady*, 175 W.Va. 249, 332 S.E.2d 262 (1985); *State ex rel. Vapor Corporation v. Narick*, 173 W.Va. 770, 320 S.E.2d 345 (1984).

The primary issue in the case presently before this Court is whether the findings of fact and conclusions of law contained in the lower court's August 25, 2006, order will be deemed binding upon TIG in the subsequent bad faith action. During oral argument of this matter, counsel for TIG represented that TIG was not necessarily attempting to dismantle the entire settlement agreement; it has agreed to the payment of the settlement limits of $500,000.00 and has in fact paid such amount, notwithstanding its objection to the $1.5 million judgment confessed by Mr. Galloway. It simply seeks protection from the far-reaching effects of the underlying order to the extent that such findings may be deemed to bind TIG in the bad faith action yet to be litigated.

■ Our analysis of this issue is predicated upon the principle that the issues to be addressed in the bifurcated bad faith action are separate questions, dependent only in part upon the underlying facts found by the lower court. As aptly recognized by the Kansas court in *Bridges for Bridges v. Bentley by Bentley*, 716 F.Supp. 1389 (D.Kan. 1989), the bad faith cause of action is "a suit involving a new party and litigating the existence of a new liability." 716 F.Supp. at 1392. Collateral estoppel principles obviously remain in effect. However, application of such principles is improper where the party against whom they are asserted did not have a full and fair opportunity to litigate the issues involved. As this Court explained in syllabus point one of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995),

Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party

or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

 *See also Holloman v. Nationwide Mut. Ins. Co.*, 217 W.Va. 269, 617 S.E.2d 816 (2005); *Haba v. Big Arm Bar and Grill, Inc.*, 196 W.Va. 129, 468 S.E.2d 915 (1996). In syllabus point eight of *Conley v. Spillers*, 171 W.Va. 584, 301 S.E.2d 216 (1983), this Court emphasized: "A fundamental due process point relating to the utilization of collateral estoppel is that any person against whom collateral estoppel is asserted must have had a prior opportunity to have litigated his claim."

 In the present case, TIG was not permitted to participate in the settlement enforcement hearing and thus cannot be deemed to have had a full and fair opportunity to litigate the issue. More specifically, the order in question expressly declares that TIG will have the opportunity to challenge the $1.5 million confessed judgment by Mr. Galloway. This case presents the classic tripartite configuration in which a party to a bifurcated bad faith action was not a party in the underlying action, despite the reality that such entity furnished counsel for the defendant in that underlying action. The fact remains that Mr. Wilmoth, as counsel for Mr. Galloway hired through TIG, was not protecting the interests of the insurance company, TIG, while the settlement negotiation matters were being litigated in the lower court. His duties as counsel ran solely to the interests of Mr. Galloway.

We find that the court entertaining the bifurcated bad faith action will be required to determine the admissibility of the August 25.2006, order at issue in this appeal. If admitted in that forum, the order and any part of it will be subject to challenge by TIG, as specifically stated in the order. The fact that the defendant, Mr. Galloway, was willing to confess judgment of $ 1.5 million may

indeed constitute admissible evidence in the bad faith action, but it does not foreclose his insurer, TIG, from challenging that issue or its relevance in whole or in part in the bifurcated bad faith action. TIG properly reserved the right to object to the consent judgment beyond policy limits, and the lower court recognized and incorporated that right to object into the stated findings of the order.

An insurer's right to challenge a judgment to which an insured has confessed was addressed by the Colorado Court of Appeals in *Ross v. Old Republic Insurance Co.*, 134 P.3d 505 (Colo.App.2006).[6] The court found that such challenge was not prohibited as an improper collateral attack. The *Ross* court explained that the insurer, similar to TIG in this instance, was not a party to the confessed judgment and had not agreed to be bound by the judgment. The Ross court held as follows:

> A consent judgment is distinguishable in some respects from a judgment resulting from contested litigation carried to conclusion by judicial determination. A consent judgment is not a judicial determination of any litigated right, and it is not the judgment of the court, except in the sense that the court allows it to go upon the record and have the force and effect of a judgment.

134 P.3d at 511. The consent judgment in *Ross* was also entered into without the participation of parties with incentive to protect the insurer's interests. The *Ross* court recognized:

> When dealing with consent judgments, courts must ensure that circumstantial guarantees of trustworthiness exist concerning the genuineness of the underlying judgment. The real concern is that the settlement may not actually represent an arm's length determination of the worth of the plaintiff's claim. When the insured actually pays for the settlement of the claim or when the case is fully litigated, the amount of the settlement or judgment

**6.** Certiorari was granted by the Supreme Court of Colorado in *Old Republic Insurance Co. v. Ross*, 2006 WL 2942523 (Colo.2006), on limited issues not relevant to the present discussion of the Ross holdings. Certiorari was granted only on issues regarding prejudgment interest and

whether the settlement agreement constituted an enforceable judgment against the defendant company which existed apart from the confessed judgment to which it stipulated. Certiorari was denied on all other issues, and no opinion has yet been issued.

can be assumed to be realistic. However, the settlement amount in a consent judgment with a covenant not to execute is more suspect.

*Id.* at 511–12.

The *Ross* court examined the conflicting interests of the parties to the agreement, reasoning as follows:

[T]he parties, none of whom had an incentive to represent or protect Old Republic's interests, determined the amount of the judgment to be collected against Old Republic. Unlike a judgment entered by a neutral fact finder, the consent judgment here was entered by parties whose incentive was to pursue an action against Old Republic, which was not a party to the judgment.

*Id.* at 512 (internal quotations omitted). The *Ross* court explained that "[l]egal maneuvering, under which the stipulation becomes a judgment, should not permit the accomplishment by indirection of that which could not be done directly." *Id.* (quoting *Marsh v. Warren*, 126 Colo. 298, 248 P.2d 825, 828 (1952)); *see also Insurance Co. of North America v. Whatley*, 558 So.2d 120 (Fla.Dist. App.1990) (holding that factual determinations made during prior adjudication are not binding on insurer in subsequent adjudication concerning coverage, where interests of insured and insurer are antagonistic in initial tort adjudication with third party); *Davin v. Athletic Club of Overland Park*, 32 Kan. App.2d 1240, 96 P.3d 687, 691 (2004) (holding that liability insurer severed privity with insured by hiring attorney to defend insured under reservation of rights, and, thus, consent judgment against the insured had no collateral estoppel effect in judgment creditor's garnishment action against the insurer, holding that "[p]arties to litigation cannot concoct a scheme agreeing to a declaration of negligence and a $300,000 judgment and then expect the insurance company to be bound by that agreement without being able to defend itself against the liability.").

Based upon the foregoing, we hold that a consent or confessed judgment against an insured party is not binding on that party's insurer in subsequent litigation against the insurer where the insurer was not a party to the proceeding in which the consent or confessed judgment was entered, unless the insurer expressly agreed to be bound by the judgment. Therefore, an attack on the consent or confessed judgment in the subsequent litigation by an insurer who did not expressly agree to such judgment is a permissible direct, not collateral, attack on the consent or confessed judgment. In the present case, since the lower court bifurcated the bad faith portion of the underlying claim and has not yet entered into litigation of that matter, it is not within the province of this Court to address additional matters which might become pertinent in the bad faith claim.[7] The primary issue to be resolved in this appeal is the extent to which the specific August 25, 2006, order under inquiry may be utilized against TIG when the bifurcated bad faith claim is ultimately litigated.[8] Thus, subsequent to the filing of this opinion, the

---

7. In *Strahin v. Sullivan*, 220 W.Va. 329, 647 S.E.2d 765 (2007), this Court discussed principles relevant to a third party's attempt to recover against an insurer in excess of policy limits pursuant to a consent judgment which included a covenant not to execute against the insured. In *Strahin*, the injured party was the assignee of the rights of the insured. *See also In re Tutu Water Wells Contamination Litigation*, 78 F.Supp.2d 423, 432 (D.Virgin Islands 1999) (indicating that "[r]esearch, however, has revealed only a handful of cases in which third parties, seeking to enforce a consent judgment which included a covenant not to execute against the insured, have been entitled to recover against an insurer in excess of policy limits."); *Lida Mfg. Co., Inc. v. U.S. Fire Ins. Co.*, 116 N.C.App. 592, 448 S.E.2d 854 (1994).

8. TIG also contends that the lower court erred in addressing Mr. Galloway's alternative motion for injunctive relief on the issue of the protection of his personal assets without providing notice that such issue would be addressed. In this Court's review of the record, however, it appears that the protection of Mr. Galloway's personal assets was an issue that was necessarily addressed within the hearing on the settlement negotiations. It was an integral component of the Mr. Galloway's incentive to enter into a settlement designed for his own protection. Thus, it was a necessary issue for inclusion within the hearing on the motion to compel enforcement of the settlement agreement. We do not find that the lower court erred in entering conclusions with regard to that issue which was, in the view of this Court, inextricably intertwined with the fundamental matters at issue.

lower court will progress forward on the course it previously set, dissolving the stay and proceeding with discovery on the bad faith claim.

Within the litigation of the bad faith claim, the issue of attorney-client privilege will be addressed. In this appeal, TIG contends that the lower court erred in approving the portion of the settlement which permitted Mr. Galloway to waive his rights to assert his attorney-client privilege. TIG is concerned that the order might thereby be interpreted to also waive TIG's attorney-client privilege to certain pre-settlement documents.

 In *State ex rel. Allstate Insurance Co. v. Gaughan*, 203 W.Va. 358, 508 S.E.2d 75 (1998), this Court explained that an insurer may assert quasi attorney-client privilege to communications in the insured's file in a third-party bad faith action even where an insured has signed a release of his claim file. "All communications in an insured's claim file generated on and after the filing date of a third-party's complaint against an insured, are presumptively quasi attorney-client privilege communications." 203 W.Va. at 373, 508 S.E.2d at 90. "The quasi attorney-client privilege belongs to the insurer, not the insured, and may be waived only by the insurer." *Id.* at 372, 508 S.E.2d at 89.[9]

 In *State ex rel. Brison v. Kaufman*, 213 W.Va. 624, 584 S.E.2d 480 (2003), this Court decided that, within the context of a first-party bad faith action against an insurer, the attorney-client privilege and work product rule attach to documents contained in an insured claim file and litigation file. Syllabus point seven of *Brison* explained:

> Where the interests of an insured and his or her insurance company are in conflict with regard to a claim for underinsured motorist coverage and the insurance company is represented by counsel, the bringing of a related first-party bad faith action by the insured does not automatically result in a waiver of the insurance company's attorney-client privilege concerning the underinsurance claim.

This Court also examined the nature of attorney-client privilege conflicts within the bad faith context in *State of West Virginia ex rel. Allstate Ins. Co. v. Madden*, 215 W.Va. 705, 601 S.E.2d 25 (2004). In that case, this Court recognized that even "[i]f the materials sought to be protected from disclosure do not satisfy the criteria necessary for the assertion of the attorney-client privilege, they nonetheless may be insulated from discovery by resort to the work product doctrine." 215 W.Va. at 714, 601 S.E.2d at 34.

 This Court finds that the waiver of attorney-client privilege to which the order refers impacts only the privilege Mr. Galloway would be entitled to assert on his own behalf. It will not affect TIG's rights to assert any attorney-client privilege belonging to TIG or to protect attorney-client product to the extent that TIG may independently assert such rights. Moreover, the lower court may, upon proper application, require a

---

9. TIG also asserts that the lower court order permitted hearsay testimony by Mr. Wilmoth regarding settlement discussions. Specifically, TIG contends that Mr. Wilmoth submitted hearsay testimony regarding a telephone conversation with Mr. Rapponotti on May 4, 2005. Mr. Wilmoth testified that he perceived a meeting of the minds with regard to settlement because Mr. Rapponotti said "okay" when discussing the allegedly chosen settlement potential. We find no reversible error in the admission of Mr. Wilmoth's testimony regarding that conversation. Even where a court wrongly admits hearsay evidence, an appellate court will not disturb a resulting order, on that basis alone, where the admission constitutes harmless error and the appellate court is reasonably assured that the error did not affect the substantial rights of the parties. Rule 61 of the West Virginia Rules of Civil Procedure provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Additionally, the admission of hearsay testimony is generally considered to be harmless error where the information in question is cumulative of other legally admissible evidence showing the same fact.

privilege log to be filed describing the nature of the documents or communications which may be deemed privileged, and the court may then properly assess the applicability of the alleged privilege.

### B. Request for Writ of Prohibition on Attorney Fee Issue

Regarding TIG's request for a writ of prohibition on the attorney fee issue, TIG contends that the lower court erred in entering its October 4, 2006, order requiring TIG to pay attorney fees. Further, TIG contends that even if it is determined that an award of attorney fees was appropriate, the amount of fees is excessive.[10]

 In syllabus point two of *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986), this Court held: "As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement." This principle is acknowledged as "the American rule" and is designed to achieve "equal access to the courts for the resolution of *bona fide* disputes." *Id.* at 52, 365 S.E.2d at 250; *see also Nelson v. West Virginia Public Employees Ins. Bd.,* 171 W.Va. 445, 450, 300 S.E.2d 86, 91 (1982). Judicial exceptions to that rule have been consistently noted, as recognized in syllabus point three of *Sally–Mike:* "There is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons."

The potential for an award of attorney fees in a case involving a breached settlement agreement was recently addressed by this Court in *Sanson v. Brandywine Homes, Inc.,* 215 W.Va. 307, 599 S.E.2d 730 (2004). In Sanson, the plaintiffs, subsequent to an alleged agreement regarding settlement, argued that they had not granted formal authority to settle. The circuit court held a hearing on the issue, ultimately concluding that the settlement agreement should be en-

forced and that attorney fees should be paid by the party causing the delay in resolution. In approving the award of attorney fees, this Court explained: "Having determined that a valid settlement agreement was made, we do not believe the circuit court abused its discretion by ordering the Sansons to pay Skyline's attorney's fees and costs incurred to enforce the settlement." 215 W.Va. at 313, 599 S.E.2d at 736; *see also State ex rel. Bronson v. Wilkes,* 216 W.Va. 293, 607 S.E.2d 399 (2004). In evaluating the competing claims in *Sanson,* this Court observed that the defendants had fully performed their obligations by tendering the settlement check and release. The Sansons returned the check three months later, forcing the motion to enforce the settlement agreement. This Court approved the circuit court's reasoning that the defendant "should not have to bear the financial burden caused by the [plaintiffs'] attempt to rescind a valid and enforceable settlement agreement." 215 W.Va. at 312, 599 S.E.2d at 735.

 With specific regard to insurance claims, this Court held as follows in syllabus point one of *Hayseeds, Inc. v. State Farm Fire & Casualty,* 177 W.Va. 323, 352 S.E.2d 73 (1986): "Whenever a policyholder substantially prevails in a property damage suit against its insurer, the insurer is liable for: (1) the insured's reasonable attorneys' fees in vindicating its claim; (2) the insured's damages for net economic loss caused by the delay in settlement[;] and [ (3)] damages for aggravation and inconvenience." Expanding on that principle, this Court, in *Jordan v. National Grange Mutual Insurance Co.,* 183 W.Va. 9, 393 S.E.2d 647 (1990), observed as follows:

> The rationale set forth in *Hayseeds, Aetna Casualty & Surety Co. v. Pitrolo*[176 W.Va. 190, 342 S.E.2d 156 (1986)] and in *Thomas*[*v. State Farm Mutual Automobile Ins. Co.,* 181 W.Va. 604, 383 S.E.2d 786 (1989)] for allowing the recovery of reasonable attorney's fees from one's own insurer is applicable whether the insured substantially prevails in the litigation as a

---

**10.** By separate order also entered on October 4, 2006, the lower court granted attorney fees to the Horkulics' counsel for 101.5 hours and set the rate of $500.00 per hour for a total award of $50,750.00, plus expenses in the amount of $54.00.

result of a settlement or as the result of a jury verdict. In either case, "the insured is out his [or her] consequential damages and attorney's fees."

183 W.Va. at 12, 393 S.E.2d at 650 (quoting *Hayseeds,* 177 W.Va. at 329, 352 S.E.2d at 79).

In the present case, the lower court stated as follows in its October 4, 2006, order: "this Court has no hesitancy in finding that the conduct of TIG in delaying the implementation of an agreed settlement for nearly one year is nothing other than oppressive." The lower court, relying upon *Sanson,* indicated that the non-breaching party should not have to bear the financial burden caused by another party's attempt to rescind or invalidate an enforceable settlement agreement. The appropriate standard for such a determination was discussed during an August 25, 2006, hearing on the issue of attorney fees. TIG argued that because it was precluded from participating in the plenary hearing, it had never been granted an opportunity to present issues pertinent to a determination of its obligations and its degree of culpability in the postponement of a finalized settlement. Specifically, TIG maintained that it had been "literally sitting on the sidelines" waiting for confirmation of an authentic, final settlement agreement TIG also asserted that "[s]o far as even oppressiveness, I don't see any fact put forth by Mr. Fitzsimmons that TIG was acting in any bad way. I'll just use the term 'bad' to encompass all the different terms that were used in the *Sally–Mike* case."

In response to TIG's argument in that regard, the lower court expressly addressed the *Sanson* opinion and stated: "I think, quite frankly, if I had the authority, which I do not, that I would take *Sanson–Brandywine* and basically say, anytime that you are enforcing a settlement agreement and you prevail, you shouldn't have to be burdened with those expenses...." The limitation in that argument, however, is that this Court, in *Sanson,* encountered and specifically identified a very simple, uncomplicated course of events: "Skyline fully performed its obligations by tendering the settlement agreement and release after it was notified that the Sansons accepted the settlement. Three

months later, the Sansons returned the settlement check, claiming that no agreement had ever been reached." 215 W.Va. at 312, 599 S.E.2d at 735. Unlike the case at bar, there was apparently minimal opportunity in *Sanson* for misunderstanding, miscommunication, or a legitimate question regarding the parameters of the settlement contemplated by the parties. On the contrary, the present case is littered with examples of uncertainty with regard to the precise parameters of the settlement, its terms, and the consent of the integral parties.

 Thus, this case is clearly distinguishable from *Sanson.* Under the unique facts of this case, we find that it was inequitable to permit an award of attorney fees against TIG without a full evidentiary hearing and the opportunity for TIG to participate fully. The *Sally–Mike* precept referencing the authority to award attorney fees "when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons" remains viable, and an effort must be made to determine the extent to which the losing party acted in such manner. 179 W.Va. at 51, 365 S.E.2d at 249.

In discussing the exceptions to the general "American rule" that a litigant is generally responsible for his own legal fees and such fees are not recoverable from the opposing party in the absence of statute, rule of court, or agreement, other jurisdictions have also recognized that circumstances indicating obduracy of one party may justify the imposition of attorney fees. The term "obdurate" has been defined by Webster's dictionary as "stubbornly persistent in wrongdoing." Webster's New Collegiate Dictionary, 784 (Merriam Webster 1979). In the realm of legal discussions, the term appears to be rarely defined with precision. Other substitutes for the term obduracy include such terminology as this Court utilized in *Sally–Mike,* such as bad faith, vexatiousness, wantonness, oppressiveness, or obstreperousness. *See, e.g.,* 42 Pa.C.S.A. § 2503(7) (1978) (Repl.Vol.2004) (Pennsylvania section of Judicial Code permitting a party to be awarded counsel fees as a sanction against another party for dilatory, obdurate or vexatious conduct during the pendency of an action).

A proper factual record demonstrating obduracy must be established. In *Upson v. Board of Trustees*, 124 N.H. 787, 474 A.2d 582 (1984), for instance, the court held that attorney fees could not be awarded where there had been no showing of obduracy sufficient to justify such an award. 474 A.2d at 584. The underlying action in *Upson* involved entitlement to apply for disability retirement benefits. Holding that the plaintiff was entitled to apply for benefits, the court examined the issue of assessment of attorney fees and found that such fees are to be awarded where litigation had been necessary to secure a clearly defined and established right. However, the court further found that the absence of evidence of bad faith precluding a finding of entitlement to attorney fees as a matter of law. The court remanded to allow development of the issue of bad faith. *Id.*

Similarly, in *Oakwood v. Makar*, 11 Ohio App.3d 46, 463 N.E.2d 61 (1983), the Court of Appeals of Ohio found that attorney fees were not to be awarded where a party mistakenly misallocated funds, since no fraudulent purpose for the accounting errors was evident. The *Oakwood* court held that no "express finding" had been made showing that the defendant had acted in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons. 463 N.E.2d at 66. "Without a showing of fraudulent purposes on the part of appellant, the award of attorney fees is unwarranted." *Id.*

As addressed above, a request for writ of prohibition will be examined with emphasis upon whether the "lower tribunal's order [was] clearly erroneous as a matter of law." *Hoover*, 199 W.Va. at 15, 483 S.E.2d at 15, syl. pt. 4. Thus, under the facts of this case, we find that the lower court erred in granting attorney fees against TIG without allowing TIG to participate in the evidentiary hearing addressing the pertinent issues culpability for the extensive delays of this case. It is appropriate to grant a writ of prohibition and to remand this matter for a full evidentiary hearing to determine the extent of TIG's culpability in delaying the settlement.

Subsequent to the evidentiary hearing on remand, if the lower court determines that attorney fees should be assessed against TIG, the lower court shall ascertain the reasonable award by reference to syllabus point four of *Aetna Casualty & Surety Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986), in which we held as follows:

> Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

### IV. Conclusion

The August 25, 2006, order of the Circuit Court of Hancock County is affirmed, and TIG's request for a writ of prohibition on the issue of the award of attorney fees is granted as moulded.

Affirmed; writ granted as moulded; case remanded.

Chief Justice MAYNARD, and Justice DAVIS concur and reserve the right to file concurring opinions.

DAVIS, J., Concurring:

(Filed Feb. 21, 2008)

I agree fully with all portions of the majority's decision in this case. I choose to write separately merely to point out that, in granting as moulded the petition for writ of prohibition on the issue of attorney fees filed by TIG Insurance Company (hereinafter

"TIG"), this Court has made no determination with respect to the reasonableness of those fees. Insofar as TIG was denied the opportunity to participate in the hearing wherein it was required to pay the attorney's fees incurred in connection with the Horkulics' efforts to compel enforcement of the compromise settlement agreement, this Court has properly remanded the case for "a full evidentiary hearing to determine the extent of TIG's culpability in delaying the settlement." Maj. Op. at 465, 665 S.E.2d at 299. *See, e.g., Kanawha Valley Radiologists, Inc. v. One Valley Bank, N.A.,* 210 W.Va. 223, 229, 557 S.E.2d 277, 283 (2001) ("We have previously determined, on numerous occasions, that a circuit court has erred by failing to afford a party notice and the opportunity to be heard prior to awarding attorney's fees."); *Czaja v. Czaja,* 208 W.Va. 62, 75–76, 537 S.E.2d 908, 921–22 (2000) ("In failing to accord Appellant's counsel an opportunity to respond to the lower court's basis for assessing fees and costs, the most basic of all protections inherent to our judicial system has been violated."); *Daily Gazette Co. v. Canady,* 175 W.Va. 249, 251, 332 S.E.2d 262, 264 (1985) ("'Like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record.)'" (quoting *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766–67, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488, 501–02 (1980)).

Additionally, this Court has properly pointed out that, in the event that the lower court determines that attorney fees should be assessed against TIG, the lower court must evaluate the reasonableness of the award pursuant to the factors set out in Syllabus point 4 of *Aetna Casualty & Surety Company v. Pitrolo,* 176 W.Va. 190, 342 S.E.2d 156 (1986). Indeed, nothing in the majority opinion should be read as concluding that the amount of the attorney fees claimed by the Horkulics' is *per se* excessive. *See, e.g., Claypool v. Barnhart,* 294 F.Supp.2d 829 (S.D.W.Va.2003) (awarding $18,000 in attorney's fees for 12.56 hours of legal work based on contingency fee agreement); *Arneault v. Arneault,* 216 W.Va. 215, 605 S.E.2d 590 (2004) (awarding $241,034.42 for attorneys and experts based upon proper proof). The determination of whether the fees are reasonable is simply a fact driven question that must be assessed under the *Pitrolo* factors.

Accordingly, I concur in the majority opinion. I am authorized to state that Chief Justice MAYNARD joins in this concurrence.