CONTINENTAL CASUALTY
CO., Plaintiff,

v.

Patrick L. WESTERFIELD, representative of the estate of Frank O. Westerfield, and Charles Hempel, Defendants,

and

Patrick L. WESTERFIELD, representative of the estate of Frank O. Westerfield, Third–Party Plaintiff,

v.

INSURANCE CO. OF NORTH AMERICA, Interstate Fire & Casualty Co., United States Fire Insurance Co., Hartford Accident & Indemnity Co., and St. Paul Fire & Marine Insurance Company, Third–Party Defendants, Counterdefendants, Counterclaimants and Third–Party Plaintiffs,

v.

Roy and Virginia TAUCHE REVOCABLE LIVING TRUST, the Frances M. Graham Revocable Trust, et al., and Patrick L. Westerfield, representative of the estate of Frank O. Westerfield, and Charles Hempel, Third–Party Defendants and Counterdefendants.

CIV No. 94–0412 JC/WWD.

United States District Court,
D. New Mexico.

Jan. 16, 1997.

See also 108 F.3d 274.

Lisa M. Burke & Joseph Frontino, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, NM, Wallace A. Christensen, Roland G. Schroeder & Gary V. Dixon, Ross, Dixon & Masback, Washington, DC, for Plaintiff Continental Casualty.

Floyd D. Wilson, Barbara Pryor, Wilson & Pryor, Albuquerque, NM, for Defendant Westerfield.

Richard D. Yeomans, Guebert & Yeomans, Albuquerque, NM, for Defendant Charles Hempel.

Jeffrey R. Brannen, Brannen & Associates, Santa Fe, NM, Kevin F. Amatuzio, Joel A. Kolodny, Christopher J. Kuelling, Montgomery, Green, Jarvis, Kolodny & Markusson, Denver, CO, for Third–Party Defendant INA.

M. Clea Gutterson, William P. Gralow, Civerolo, Gralow & Hill, Albuquerque, NM, for Third–Party Defendant United States Fire Insurance Co.

Charles R. Peifer, Browning & Peifer, Albuquerque, NM, Janet R. Davis, David M. Menditto, Phillip R. King, Bates, Meckler, Bugler & Tilson, Chicago, IL, for Third–Party Defendant Interstate Fire & Casualty Co.

Paul G. Bardacke, John G. Baugh, Eaves, Bardacke & Baugh, Albuquerque, NM, for Third–Party Defendant Hartford Accident & Indemnity Co.

William C. Madison, Robert J. Mroz, Judith A. Luck, Madison, Harbour, & Mroz, Albuquerque, NM, for Third–Party Defendant St. Paul Fire & Marine Insurance Co.

Jonathan B. Sutin, Sutin, Thayer & Brown, Albuquerque, NM, for Third–Party Defendant Roy & Virginia Tauche Revocable Living Trust.

### MEMORANDUM OPINION ON ISSUE OF COLLUSION

CONWAY, Chief Judge.

The present action concerns various insurance companies' liability, if any, for their refusal to defend or indemnify Frank Westerfield, now deceased, against claims of fraud and malpractice brought by Charles Hempel in 1992 in New Mexico District Court. In a Memorandum Opinion issued August 3, 1995, I set forth in greater detail certain factual allegations and legal theories of the parties. Thus, I will only briefly address these concerns insofar as they set the context in which the Court is now asked to rule.

### I. GENERAL BACKGROUND

Hempel's state court lawsuit challenged Westerfield's legal counsel with respect to the administration of a testamentary trust established by Daniel Mudge. Hempel alleged that Westerfield, from 1964 to 1991, enabled the trustee of this trust, the First National Bank of Albuquerque, to divert stock or stock proceeds from the primary intended beneficiary, Ada Mudge, to residuary beneficiaries Frances Graham and Virginia Tauche, in violation of Daniel Mudge's will. Ada Mudge was Hempel's mother. Hempel's complaint contained allegations of fraud, breach of fiduciary duty, negligence and gross negligence, tortious interference, conversion, legal malpractice, *prima facie* tort, and breach of contract.

On March 2, 1994, Judge Ashby of the New Mexico Second Judicial District Court entered findings of fact, conclusions of law and a stipulated judgment against Westerfield in the amount of approximately $29.46 million.[1] Judge Ashby entered judgment after Hempel and Westerfield executed a set-

---

1. Judge Ashby later set-off the judgment by $3.05 million, received by Hempel from other settling co-defendants and insurers, for a total judgment against Westerfield of $26.38 million.

tlement agreement in which Westerfield eliminated his personal liability for the resultant judgment by virtue of a covenant of non-execution, in exchange for which he assigned to Hempel 90 percent of the net proceeds of any recovery Westerfield might obtain by suing his insurance carriers. First National Bank paid over one million dollars in settlement to Hempel, and Virginia Tauche and Frances Graham, or their representatives, settled with Hempel for $650,000.

Despite the fact that the parties had settled, Hempel and Westerfield engaged in the perfunctory formality of presenting Hempel's case to Judge Ashby on March 22, 1994. Judge Ashby heard less than a day's worth of Hempel's uncontroverted evidence before he entered his "findings." Westerfield provided no opening statement, witness testimony, cross-examination, or closing argument. The only evidence Westerfield submitted was a deposition transcript which merely authenticated documents Hempel sought to admit. Judge Ashby signed these findings, previously prepared by Hempel's counsel, at the conclusion of Hempel's case that same day. They consist of a conclusion that Westerfield committed "negligence, as well as participation in a breach of fiduciary duty."

As I previously noted in my August 3, 1995 opinion, aspects of the Hempel findings are contradictory. Although the conclusions of law state that Westerfield's actions amounted to professional negligence, many of the factual findings describe intentionally wrongful and fraudulent conduct on the part of Westerfield. Whether Westerfield's acts amounted to professional negligence or intentional fraud is significant because the insurance policies at issue in this case exclude coverage for dishonest or fraudulent acts.

Nevertheless, I found that certain aspects of the settlement may independently require that I declare that the insurance companies are not bound by the state court *Hempel* judgment as a matter of law. I explained that the issue of "collusion" should be addressed initially.

In lieu of attempting to interpret and ascertain the legal significance of the Hempel findings, which appear to be irreconcilable, the Court would rather address what is the primary and potentially dispositive issue in this case: whether these findings and the concomitant settlement that produced them were the result of bad faith, collusion, or fraud, such that the insurance companies have no obligation to indemnify against the $29.46 million judgment.

Of special concern was the possibility that significant judicial resources would be wasted in evaluating peripheral issues when this paramount issue remained unresolved. I requested that the parties fully brief the issue of possible collusion in the form of motions for summary judgment. Having evaluated the briefs and all documentary evidence submitted, I am now in a position to dispose of the primary issue in this case. I conclude that the defendant insurance companies are entitled to partial summary judgment on the basis of collusion as to the settlement and resulting judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). It is the movant's burden to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321–323, 106 S.Ct. 2548, 2551–2553, 91 L.Ed.2d 265 (1986). Upon such a showing,

> [a]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

FED.R.CIV.P. 56(e). Viewing the evidence in the light most favorable to the non-movant, there is no issue for trial unless the Court finds sufficient evidence to support a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III. ENFORCEMENT OF A SETTLEMENT AGAINST A NON–DEFENDING INSURER

▄▄▄ New Mexico law requires that settlements entered without the insurer's

knowledge or consent be reasonable and in good faith, *even if* the insurer breached its duty to defend. *See American Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 110 N.M. 741, 746, 799 P.2d 1113 (1990) (even where insurer's failure to defend was wrongful, any "settlement must be reasonable, and the insurer is not precluded from asserting as a defense that the settlement was unreasonable"); *State Farm Fire & Cas. v. Price*, 101 N.M. 438, 445, 684 P.2d 524 (Ct.App.1984) (insurer may contest both the insured's good faith in making a settlement and its reasonableness). In evaluating the reasonableness of a settlement, the trier of fact may take into consideration "any evidence of bad faith, collusion, or fraud." *Servants of the Paraclete, Inc. v. Great Am. Ins. Co.*, 866 F.Supp. 1560, 1574 (D.N.M.1994) (citation omitted). Moreover, the implied covenant of good faith and fair dealing binds the insured, as well as the insurer. *Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 102 N.M. 28, 30, 690 P.2d 1022 (1984). *See also Price*, 101 N.M. at 444, 684 P.2d 524 ("the obligation to deal fairly and honestly rests equally upon the insurer and the insured").

The Court is still unaware of any New Mexico cases involving an insurer's duty to indemnify against a stipulated judgment, coupled with a covenant of non-execution, in circumstances replete with collusion. Cases from other jurisdictions, however, provide guidance. A "covenant judgment" of this sort warrants heightened scrutiny.

> [A] stipulated judgment ... which is coupled with a covenant not to execute against the insured brings with it a high potential for fraud or collusion. With no personal exposure the insured has no incentive to contest liability or damages. To the contrary, the insured's best interests are served by agreeing to damages in any amount as long as the agreement requires the insured will not be personally responsible. . . .

*Pruyn v. Agricultural Ins. Co.*, 36 Cal. App.4th 500, 42 Cal.Rptr.2d 295 (Ct.App. 2 Dist.1995), *as modified* (July 12, 1995), *as modified on denial of reh'g*, 42 Cal.Rptr.2d 295 (July 19, 1995).

In reviewing the relevant state case law, the author of a comprehensive article on the subject has compiled "indicators" of bad faith and collusion assessed by courts when there is a collateral attack on such settlements. *See* Stephen R. Schmidt, *The Bad Faith Set-up*, 29 TORT & INS.L.J. 705 (1994). His observations have lended guidance to the Court, and are set forth below.

Collusion and fraud in this context are not necessarily tantamount to the common-law tort of fraud in that there need not be a misrepresentation of a material fact. (Cite omitted). Any negotiated settlement involves cooperation to a degree. It becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant. Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer. They have in common unfairness to the insurer, which is probably the bottom line in cases in which collusion is found.

Schmidt, *supra* at 727–28. The Court has applied this heightened scrutiny to the undisputed facts and finds that several circumstances when taken together can lead but to one reasonable conclusion—the collusive nature of the settlement and resulting state proceedings cannot bind the insurers to the $29 million judgment entered by the state court.

## IV. EVIDENCE OF COLLUSION

### A. *The Written Terms of the Settlement Agreement*

As an initial matter, I must stress that I am not ruling that a stipulated judgment coupled with a nonenforcement provision *alone* constitutes a collusive agreement. Several jurisdictions have held analogous "Mary Carter" agreements, in which the defendant retains some interest in the plaintiff's verdict against the non-settling defendants, void as a matter of public policy. Justice Wilson advocated just such a holding in his special concurrence in the case of

*Watson Truck & Supply Co. Inc. v. Males,* 111 N.M. 57, 61–64, 801 P.2d 639 (1990). The majority on the *Males* court declined to address the issue since it had not been thoroughly briefed and argued.

As Justice Wilson pointed out, settlement agreements such as the one at hand "skew the trial process" by realigning adversarial parties into a posture whereby they both will profit by a maximum judgment against the insured. Moreover, such settlements create conflicting interests that may compromise an attorney's ability to conform his or her conduct to such ethical obligations as candor towards a tribunal and avoiding unjustified litigation. *Id.* at 61–62, 801 P.2d 639. Most importantly, the point of such agreements is "not to end the litigation but to prolong it" by confusing and distorting the issues rather than resolving the parties' disputes. *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 712–14 (1996).

Thus, when the issue is properly before the court, the Supreme Court of New Mexico might some day adopt Justice Wilson's view that settlements such as "Mary Carter" agreements violate public policy. Because the undisputed facts demonstrating collusion in *this* case go well beyond the written terms of the settlement, however, I need not reach such a narrow ruling as that proposed by Justice Wilson in *Males.*

■ Collusion may be found where the evidence demonstrates an absence of conflicting interests—the "lack of opposition between a plaintiff and an insured that otherwise would assure that the settlement is the result of hard bargaining." *Independent Sch. Dist. No. 197 v. Accident and Casualty Insurance,* 525 N.W.2d 600, 606 (Minn.App.). *See also Sargent v. Johnson,* 551 F.2d 221, 232 (8th Cir.1977) (collusion occurs when plaintiff and insured enter into "a questionable collaboration ... to impose an uncompromised full balance of a judgment upon the insurer, while the insured incur[s] no real detriment").

■ Because the settlement agreement reached by Hempel and Westerfield was provided to State District Judge Ashby, they contend that collusion cannot be found as a matter of law. In order to implicate collusion, they argue, evidence must establish an intent to defraud combined with a "secret" agreement. In discussing the nature of a "collusive" suit, the United States Supreme Court noted that collusion can be present even in the absence of an intentional misrepresentation to the court.

> The Government does not contend that, as a result of this cooperation of the two original parties to the litigation, any false or fictitious state of facts was submitted to the court. But it does insist that the affidavits disclose the absence of a genuine adversary issue between the parties, without which a court may not safely proceed to judgment.... Such a suit is collusive because it is not in any real sense adversary. It does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process [citations omitted].... Whenever in the course of litigation such a defect in the proceedings is brought to the court's attention, it may set aside any adjudication thus procured....

*United States v. Johnson,* 319 U.S. 302, 304–05, 63 S.Ct. 1075, 1076–77, 87 L.Ed. 1413 (1943). By analogy, although concealment might qualify as further evidence of collusion, it is not a necessary element of a collusive agreement.

In the case at hand, the undisputed evidence establishes as a matter of law that the settlement agreement and resulting proceeding were not only devoid of competing interests; the agreement permitting Westerfield to retain a 10 percent interest in any judgment against the insurers created an actual *identity* of interest with Hempel. In essence, the larger the judgment entered by Judge Ashby, the more Westerfield stood to recover under his settlement agreement with Hempel. Both stood only to gain by any effort by Hempel to maximize the judgment and to lose with any effort by Westerfield to minimize the judgment against him. It is difficult to conceive of a less adversarial agreement. Certainly this settlement could not serve as the predicate for a trial in which the court could be assured of the " 'honest

and actual antagonistic assertion of rights' to be adjudicated." *Id.*

## B. *Events Surrounding Creation of the Settlement Agreement*

Two of Frank Westerfield's insurers, The Home Insurance Company ("Home") and St. Paul, agreed to provide him with a defense to the *Hempel* lawsuit. Briggs Cheney was retained by Home as counsel for the insured and billed over 1,000 hours to Home in defense preparation. Cheney apparently felt that Hempel had a strong case of liability against Westerfield for misadministration of the trusts and that the amount of damages constituted the focal issue to be contested. Cheney's expert calculated a $2.8 million worst case scenario for Hempel's economic damages resulting from misadministration of the trusts, well below the $30 million figure touted by John "Mike" McKetta, counsel for Hempel. Indeed, Cheney's evaluation was more in line with Hempel's November 1993 global demand of $5.5 million to settle all of his claims against all parties.

The central issue affecting the measurement of damages focused on whether the "two for one" stock splits, stock spin-offs and other distributions constituted principal or income to the Trusts. Normally such distributions are treated as principal under the Revised New Mexico Uniform Principal and Income Act, N.M.S.A. § 46–3–1, *et seq.* ("the Act"), and Cheney's lower damages figure would be appropriate. However, Hempel contended that, as permitted by the Act, Daniel Mudge expressed a contrary intent as to how these distributions should be allocated and that New Mexico law allows such contrary allocation designations to be honored.

On March 14, 1994, just one week prior to the scheduled trial setting, Westerfield retained attorney Floyd Wilson as his personal coverage counsel. Wilson, rather than Cheney, conducted settlement negotiations with Hempel's counsel, McKetta, from this date forward. McKetta had identified a $30 million pool of insurance policies issued to Westerfield, and rejected the notion of a stipulated judgment. Instead, McKetta insisted on putting on a "prima facie case" before Judge Ashby to avoid "following litigation question[ing] the reasonableness of a settlement amount."

McKetta acknowledges that he presumed Cheney would not put on an active defense in the proceedings before Judge Ashby, but denies that failure to put on an active defense was a condition of the settlement between Westerfield and Hempel. Cheney testified in his deposition, however, that putting forth no active defense was "part and parcel" of the settlement agreement reached on March 15. Moreover, Cheney insisted that Westerfield sign the following letter confirming that "by this settlement, we have tacitly agreed not to defend the action. In fact, it is not necessarily in your best interest to do so as it may impact negatively on subsequent actions against non-settling or non-participating Westerfield professional liability insurance carriers...." Cheney was uncomfortable with his understanding of the role he would play at trial, and insisted that Westerfield confirm his instructions not to put on an active defense.

## C. *The "Trial" Before Judge Ashby*

### 1. Illusion of Adversity in the Proceedings

On March 21, 1994, Judge Ashby was provided with a copy of the settlement agreement reached by Hempel and Westerfield. Although he testified that he read it, Judge Ashby believed the proceedings before him were truly adversarial even though Westerfield would not be held personally responsible for a judgment entered against him. Judge Ashby understood that the purpose for the proceeding was to "set up a bad faith claim against the nonparticipating carriers." Indeed, in a handwritten note following the trial, Judge Ashby told Cheney that he "had done a hell of a job getting [Westerfield] off the hook, leaving the nonparticipating insurors [sic] to tremble over their possible huge exposure."

Yet Judge Ashby did not then comprehend that the settlement had given Westerfield more than just "insulation" against financial loss. Judge Ashby denies that his perusal of the agreement made him aware that Westerfield actually retained a 10 percent stake in

the amount of any judgment entered against him, and neither McKetta nor Cheney mentioned Westerfield's financial interest in a maximum judgment in Hempel's favor. Thus, the presiding judge did not perceive the commonality of interest in the supposedly "adverse" parties appearing before him and that failing to actively defend could actually serve to benefit Westerfield financially.

McKetta and Cheney represented to Judge Ashby that all of Westerfield's carriers who were willing to defend had settled so that defense funds were unavailable to put on an active defense. It is not at all clear that this was the case. From the very beginning, coverage counsel for St. Paul, Robert Mroz, had agreed to provide a defense under a reservation of rights. Mroz retained Ranne Miller as Westerfield's defense counsel, and Miller recommended that he not enter an appearance because Cheney was "very capable of heading up the defense of this case."

Although there were discussions about St. Paul contributing to Cheney's defense bills, St. Paul instead gave Cheney authority to use the full amount of its indemnification limits, $300,000 under its policy 583JE07440, towards either settling or paying any judgment against Westerfield. On March 16, 1994, just days before the trial setting, Cheney wrote to Mroz with the "demand on St. Paul to defend and indemnify Mr. Westerfield" under a second policy 583JE0225, which had not been physically located. Thus, St. Paul had received demands to defend and to indemnify on two of its $300,000 policies issued to Westerfield. The record is devoid of any request by Cheney to St. Paul for payment of fees at trial or of any communication by Mroz, St. Paul or its agents refusing to provide a defense under either policy. In fact, Home paid for Cheney's appearance at the trial before Judge Ashby.

Indeed, Mroz testified that he believed that Cheney was in a "tri-partite arrangement" with St. Paul to safeguard Westerfield's interests on its behalf. Because the St. Paul policy contained a "pac-man" provision, Home agreed to pay Cheney's defense expenses in order to preserve the St. Paul indemnification limits. Mroz further testified that St. Paul relied on Cheney to see that Mr. Westerfield was protected in the Hempel litigation.

## 2. The Abdication of Any True Defense

Several defenses were available to Cheney to minimize the judgment against Westerfield, none of which were argued at trial. True, Westerfield's pretrial motion for summary judgment on the basis of statute of limitations bar had been denied. But denial of summary judgment does not necessarily equate to nonviable defense at trial—disputed material issues of fact often preclude entry of judgment as a matter of law. In fact, Judge Ashby specifically noted at trial that Hempel's case was "still open ... to statute of limitations problems" as well as arguments as to whether stock splits and stock dividends constituted principal or income to the trust.

Judge Ashby recognized that his finding as to the intent of testator would significantly affect the amount of any award, but he was given no evidence or argument in support of Westerfield's prior position that the dictates of the Act controlled the allocations. Moreover, Judge Ashby's decision to allocate dividends in the form of stock to income rather than principal should not have foreclosed even further defenses available to Westerfield. McKetta represented to Judge Ashby that Hempel was advocating a damages scenario which allocated stock spin-offs and stock splits to principal and excluded them from the calculation of Ada Mudge's damages. Cheney was aware that Hempel's accountant, Thomas Gilmore, had included as damages some transactions by calling them "stock dividends" although they could more properly be classified as "stock splits" according to Thomas Glass, Hempel's own expert. Again, the defense made no attempt to reduce the damages evaluation.

Cheney did not call a single witness, never objected or asked a question on cross-examination and passed up every opportunity to present a position contrary to that of Hempel. In short, there was no opposition to any of the evidence or arguments proffered by McKetta. As Cheney put it in response to deposition questioning, "[t]he Hempels put

on a case and we did not refute it. It was not what I would call a real trial, no."

Most significantly, however, Cheney failed to argue the application of apportionment of fault under New Mexico law as to any judgment entered against Westerfield. Judge Ashby expressly found that the first trustee (Eugene Graham), First National Bank in Albuquerque, Frances Graham and Virginia Tauche *all* participated in willful or knowing breaches of trust which "proximately caused Ada Mudge to fail to receive the amounts to which she was entitled under the will of Daniel Mudge." Yet Cheney failed to even request an apportionment of damages as to these tortfeasors and thereby reduce the amount of the judgment to be entered against Westerfield. Given that Cheney attended the proceedings and billed Home for his appearance at the "trial on the merits," his failure to even propose apportionment based upon the evidence submitted by Hempel could not realistically be characterized as an effort to minimize Westerfield's personal defense costs.

### 3. The Elimination of Any Defense by Others

On the first scheduled day of trial, McKetta arranged a last minute full settlement with the remaining defendants including Graham, Tauche and the Recipient Trusts for $650,000. Unlike the agreement with Westerfield, this written settlement specifically required that these parties would not "take any active role" in Hempel's trial against Westerfield. This express condition of settlement eliminated any chance that Judge Ashby would hear any evidence or argument contrary to that presented by Hempel in his *prima facie* case on liability and as to damages.

### 4. Strategic Moves to Affect Coverage

Originally, McKetta's proposed draft of findings of fact and conclusions of law included a conclusion, adopted later by Judge Ashby, that "Westerfield's negligence therefore occurred continuously and in each of the years from 1964 through 1991 inclusively." However, the findings and conclusions submitted to Judge Ashby, and ultimately adopted by him, coupled this finding with a new term added by McKetta—that Westerfield's "negligence in at least the years 1964 though *1983*, inclusively, was the proximate cause of the losses suffered by Ada Mudge [emphasis added]." Although Westerfield asserts that he "has no knowledge as to McKetta's motive" with respect to the language change, clearly the variation was intended to avoid attributing Hempel's damages to the entire post–1983 period during which the settling insurer Home had provided coverage. Thus, if found to be binding, all damages would be attributed to policy periods of non-settling insurers.

## V. CONCLUSION

The above facts demonstrate that Hempel's counsel, with the aid and acquiescence of Wilson and Cheney, maneuvered the proceedings to achieve the results they wanted with an expectation that the characterization of a "trial proceeding" could make legitimate that which was a sham. To fail to find collusion in fashioning an unreasonable settlement under these circumstances would be to authorize manipulation which compromises the integrity of the adversary system. A stamp of judicial approval must be more than a rubber stamp of a one-sided presentation when it is presented under the guise of a dispute. Defendant Insurers are entitled to partial summary judgment on the issue of collusion as a matter of law.

## VI. THE EFFECT OF GRANTING PARTIAL SUMMARY JUDGMENT

According to Defendants, my finding that the settlement and resulting state judgment were collusive as a matter of law should relieve them of any obligations. I believe this goes too far. Rather, it would appear that Westerfield and Hempel are not entitled to any *res judicata* or collateral estoppel effect as to the state court proceeding. As I see it at this point, the duties to defend and to indemnify are live controversies in this action and subject to a true adversarial determination.

Nevertheless, counsel have requested that once the collusion-based summary judgment motions were decided, they be given the opportunity to provide the Court with further

recommendations and direction in how to proceed. Numerous other motions have been filed which may now be rendered moot or will need to be more fully briefed. This case presents a rather complex litigation history with correspondence, pleadings, and exhibits filling several file cabinet drawers. Therefore, counsel are directed to submit to the Court within 30 days of the entry of this order a letter, jointly submitted if possible, outlining their positions on how this case should proceed towards a long-needed and expeditious resolution.