# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2017 Term**

_____

**No. 15-1018**

_____

**FILED**

**March 1, 2017**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**PENN-AMERICA INSURANCE COMPANY,**
Petitioner

**v.**

**BEECHER V. OSBORNE,**
Respondent

_____

**Appeal from the Circuit Court of Wyoming County**
**The Honorable Warren R. McGraw, Judge**
**Civil Action No. 10-C-006**

**REVERSED AND REMANDED**

_____

**Submitted: February 8, 2017**
**Filed: March 1, 2017**

John Andrew "Jack" Smith, Esq.          Timothy C. Bailey, Esq.
Flaherty Sensabaugh Bonasso PLLC    J. Ryan Stewart, Esq.
Charleston, West Virginia                     Bailey Javins & Carter, LC
Counsel for the Petitioner                     Charleston, West Virginia
                                                            Counsel for the Respondent

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.  "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002).

2.  "A consent or confessed judgment against an insured party is not binding on that party's insurer in subsequent litigation against the insurer where the insurer was not a party to the proceeding in which the consent or confessed judgment was entered, unless the insurer expressly agreed to be bound by the judgment. Therefore, an attack on the consent or confessed judgment in the subsequent litigation by an insurer who did not expressly agree to such judgment is a permissible direct, not collateral, attack on the consent or confessed judgment." Syl. Pt. 7, *Horkulic v. Galloway*, 222 W.Va. 450, 665 S.E.2d 284 (2008).

**Justice Ketchum:**

This appeal arises from a pre-trial settlement agreement between an injured plaintiff, Mr. Beecher Osborne (the Respondent), and two defendants: Allegheny Wood Products, Inc., and Heartwood Forestland Fund, IV, Limited Partnership. The pre-trial settlement agreement contains three components: (1) a consent judgment, wherein Allegheny and Heartwood agreed to a $1,000,000.00 judgment against them; (2) a covenant not to execute, in which Mr. Osborne promised not to collect the $1,000,000.00 judgment from Allegheny or Heartwood; and (3) an assignment from Allegheny and Heartwood to Mr. Osborne of all claims they may have had against Penn-America Insurance Company (the Petitioner) for failing to provide them a defense in Mr. Osborne's lawsuit.

Pursuant to the pre-trial settlement agreement, Mr. Osborne dismissed his lawsuit against Allegheny and Heartwood, and he filed a new lawsuit against Penn-America on his assigned claims to collect the $1,000,000.00 consent judgment. After Mr. Osborne and Penn-America filed competing motions for summary judgment, the circuit court entered an order on December 19, 2014, granting Mr. Osborne's motion and denying summary judgment to Penn-America. The circuit court further ordered Penn-America to pay Mr. Osborne the $1,000,000.00 consent judgment. Penn-America argues before this Court that it was entitled to summary judgment, not Mr. Osborne.

Upon review, we agree that the circuit court's summary judgment order was in error. The consent judgment is not binding on Penn-America because it was not a

1

party to the pre-trial settlement agreement or the lawsuit in which the consent judgment was entered. Moreover, under the particular facts of this case, the assignment by Allegheny and Heartwood of any claims they may have had against Penn-America to Mr. Osborne is void. Accordingly, we reverse the circuit court's summary judgment order, and we direct the circuit court to enter summary judgment for Penn-America. On remand, the circuit court shall dismiss Penn-America from Mr. Osborne's lawsuit with prejudice.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

On May 27, 2008, Mr. Osborne injured his leg in a timbering accident while working for H&H Logging Company on land owned by Heartwood and leased by Allegheny for timber harvesting operations. Mr. Osborne alleges that on that day, H&H instructed him to cut down and remove a known "danger tree," even though its hollow center and location on a steep slope presented a high risk of injury. Mr. Osborne cut down the tree without incident, after which he proceeded to divide the tree into segments for removal. Standing on one of the fallen tree's limbs, he cut into a hollow portion of the tree, which resulted in the limb rolling over onto him. This incident ended with Mr. Osborne's left leg being injured.

Thereafter, Mr. Osborne filed suit against H&H, Allegheny, and Heartwood ("first lawsuit"). Against his employer, H&H, he asserted a claim for deliberate intent, *i.e.*, deliberately exposing him to an unsafe work environment. As to the landowner,

2

Heartwood, and the timber-lessee, Allegheny, he claimed they were liable for negligently failing to inspect and/or maintain the tract of land on which he was injured and that they failed to ensure all H&H workers received proper work-related training. H&H, Allegheny, and Heartwood all filed answers denying liability.

H&H, Heartwood, and Allegheny each had commercial general liability policies in effect when Mr. Osborne was injured. H&H contacted its insurer, Penn-America, and requested a defense for itself as to Mr. Osborne's deliberate intent claim, but it did not request a defense for Allegheny or Heartwood as to the claims against them. Penn-America determined that the deliberate intent claim against H&H was excluded under its policy, and thus, it informed H&H it would not provide a defense.[1] Thereafter, H&H retained counsel at its own expense. Meanwhile, Allegheny and Heartwood requested a defense from Allegheny's insurer, Liberty Mutual Insurance. Liberty Mutual Insurance accepted coverage and provided Allegheny and Heartwood a defense.

Counsel for Allegheny and Heartwood subsequently discovered that their contract with H&H to harvest timber required H&H to defend and indemnify them for suits arising from the contract. Counsel for Allegheny and Heartwood wrote H&H on two occasions requesting that H&H and/or its insurer, Penn-America, provide them a defense. H&H failed to forward Allegheny and Heartwood's request to Penn-America.

---

[1] The exclusion on which Penn-America relied to deny coverage for Mr. Osborne's deliberate intent claims against H&H provides as follows: "This insurance does not apply to: . . . e. Employer's Liability . . . 'Bodily Injury' to: (1) An 'employee' of [H&H] arising out of and in the course of: (a) Employment by [H&H.]" In *American States Insurance Company v. Surbaugh*, 231 W.Va. 288, 300, 745 S.E.2d 179, 191 (2013), we held this exclusion to be unambiguous and enforceable.

3

Operating under the belief that H&H would forward their letters requesting a defense to Penn-America, Allegheny and Heartwood also failed to notify Penn-America of their request for a defense. Thus, Liberty Mutual Insurance continued to provide Allegheny and Heartwood's defense in the first lawsuit.

Counsel for Allegheny and Heartwood also filed a motion for leave to file a third-party complaint for declaratory relief against Penn-America for failing to provide them a defense. However, the motion was never brought up for a hearing, and the third-party complaint for declaratory relief was never filed. Nevertheless, Liberty Mutual Insurance continued to provide Allegheny and Heartwood's defense.

Thereafter, Mr. Osborne approached Allegheny and Heartwood about entering into a pre-trial settlement agreement. The lawyer hired by Liberty Mutual Insurance to defend Allegheny and Heartwood negotiated the pre-trial settlement agreement. In their pre-trial settlement agreement, and with no notice to Penn-America, Mr. Osborne, Allegheny, and Heartwood stipulated to the following facts: (1) Penn-America breached its insurance contract by failing to "provide a defense or insurance coverage related to Osborne's claims against Allegheny and Heartwood;" (2) Due to Penn-America's breach, Allegheny and Heartwood suffered damages because they were "compelled to expend funds and other resources in the defense of this action;" (3) "Allegheny and Heartwood have been compelled to mitigate the claims asserted by Osborne by [entering into a pre-trial settlement agreement] with Osborne to preserve and

4

protect the assets of Allegheny and Heartwood;"[2] and (4) Allegheny and Heartwood tried to resolve coverage issues by filing a third-party complaint for declaratory relief against Penn-America.[3]  Because Penn-America was not given notice of the parties' settlement negotiations, it was not afforded an opportunity to contest any of these stipulations.

Additionally, Allegheny and Heartwood consented to a $1,000,000.00 judgment for Mr. Osborne's leg injury, and they agreed to assign to Mr. Osborne any claims they may have had against Penn-America for failing to provide them a defense in the lawsuit.  In return, Mr. Osborne covenanted not to execute on the $1,000,000.00 judgment against Allegheny and Heartwood.  Instead, he would collect judgment from Penn-America by asserting his assigned claims.

Pursuant to the pre-trial settlement agreement, Mr. Osborne dismissed his lawsuit against Allegheny and Heartwood and filed a new lawsuit, asserting his assigned claims against Penn-America ("second lawsuit").[4]  In his complaint, Mr. Osborne stated that, "personal and corporate assets of Allegheny and Heartwood are and were exposed with no indemnity and no defense from an insurer, Allegheny and Heartwood expended funds for a defense and suffered greatly as all other assets and security were jeopardized

---

[2] As we explain in our analysis, there is no explanation in the pre-trial settlement agreement or in the record as to how Allegheny or Heartwood were required to expend funds in defending against Mr. Osborne's claims, or how their assets were at risk because of a verdict in the first lawsuit.

[3] To be clear, no third-party complaint seeking declaratory relief was ever filed.

[4] Mr. Osborne also asserted claims against H&H in the second lawsuit.  However, the parties told this Court during oral argument that Mr. Osborne has since settled his claims with H&H for approximately $8,000.00.

5

to jury verdict for Mr. Osborne's serious injuries." Mr. Osborne sought $1,000,000.00 in damages from Penn-America.

Penn-America filed an answer denying liability on Mr. Osborne's assigned claims. Penn-America further noted that none of the parties to the first lawsuit had contacted it since it first denied coverage to H&H. Thus, it had no notice of the parties' pre-trial settlement negotiation.

Finally, Penn-America attempted to challenge the reasonableness of the $1,000,000.00 consent judgment related to Mr. Osborne's injury. However, the circuit court prohibited Penn-America from reviewing the medical records or other evidence which would demonstrate the severity of Mr. Osborne's injuries.

On December 19, 2014, the circuit court entered summary judgment in Mr. Osborne's favor, finding that Penn-America is liable to him for $1,000,000.00 on the consent judgment. Penn-America now appeals the circuit court's summary judgment order to this Court, and asserts it was entitled to summary judgment, not Mr. Osborne.

## II.
## STANDARD OF REVIEW

Penn-America requests that we review an order denying its motion for summary judgment and granting summary judgment to Mr. Osborne on his assigned claims against Penn-America. Under Rule 56(c) of the West Virginia Rules of Civil Procedure, summary judgment is only appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."

6

Accordingly, "summary judgment . . . may not be granted unless the movant has established his right to the judgment beyond controversy[.]"[5]   Moreover, "A circuit court's entry of summary judgment is reviewed *de novo*."[6]   Likewise, "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."[7]

## III.
## ANALYSIS

In this case, we are called upon to examine a pre-trial settlement agreement between a plaintiff, Mr. Osborne, and two defendants, Allegheny and Heartwood.  This pre-trial settlement agreement contains three components: (1) a consent judgment, wherein Allegheny and Heartwood agreed to a $1,000,000.00 judgment against them; (2) a covenant not to execute, in which Mr. Osborne promised not to collect the $1,000,000.00 consent judgment from Allegheny and Heartwood; and (3) an assignment to Mr. Osborne of any claims Allegheny and Heartwood may have had against Penn-America, who was a non-party to the pre-trial settlement agreement.

---

[5] *Inland Oil & Transp. Co. v. U.S.*, 600 F.2d 725, 727, (8th Cir. 1979).  "Because the West Virginia Rules of Civil Procedure are patterned after the Federal Rules of Civil Procedure, we often refer to interpretations of the Federal Rules when discussing our own rules."  *See Hardwood Group v. Larocco*, 219 W.Va. 56, 61 n.6, 631 S.E.2d 619 n.6 (2006) (internal citations omitted).

[6] Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

[7] Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002).

We find that the pre-trial settlement agreement between Mr. Osborne, Allegheny, and Heartwood is unenforceable against Penn-America. For the reasons outlined below, the consent judgment is not binding on Penn-America, and the assignment of claims to Mr. Osborne is void. We address the consent judgment and assignment of claims in turn.

### A. *The Consent Judgment is not Binding on Penn-America*

First, we address the consent judgment, wherein Allegheny and Heartwood agreed to a $1,000,000.00 judgment in favor of Mr. Osborne for his injured leg. Of course, Allegheny and Heartwood knew they would not have to pay on the consent judgment because of the pre-trial settlement agreement's other components, *i.e.*, the assignment and the covenant not to execute. Rather, according to the pre-trial settlement agreement, if anyone would be responsible to pay Mr. Osborne the agreed $1,000,000.00, it would be Penn-America. Notably, Penn-America was not a party to Mr. Osborne's lawsuit against Allegheny and Heartwood, and it was not given notice of the parties' negotiation of the pre-trial settlement agreement.

The record is bare of any facts supporting $1,000,000.00 as a fair and reasonable valuation of Mr. Osborne's lawsuit against Allegheny and Heartwood. There is no evidence in the record regarding the extent of Mr. Osborne's leg injury or his medical expenses. The lawyer hired by Liberty Mutual Insurance to represent Allegheny and Heartwood in the pre-trial settlement agreement later testified that the $1,000,000.00 valuation was based on the coverage limits of Penn-America's liability policy – not the value of Mr. Osborne's claims.

8

When Mr. Osborne filed his current lawsuit against Penn-America, the circuit court prohibited Penn-America from conducting discovery on the extent of Mr. Osborne's injuries or medical expenses. It granted Mr. Osborne summary judgment, requiring Penn-America to pay him the $1,000,000.00 consent judgment.

Penn-America argues that our law clearly prohibits it from being bound to a consent judgment entered in a lawsuit to which it was not a party. We agree. Our holding in Syllabus Point 7 of *Horkulic v. Galloway*, 222 W.Va. 450, 665 S.E.2d 284 (2008), squarely addresses this issue:

> A consent or confessed judgment against an insured party *is not binding on that party's insurer* in subsequent litigation against the insurer *where the insurer was not a party to the proceeding in which the consent or confessed judgment was entered*, unless the insurer expressly agreed to be bound by the judgment. Therefore, an attack on the consent or confessed judgment in the subsequent litigation by an insurer who did not expressly agree to such judgment is a permissible direct, not collateral, attack on the consent or confessed judgment.[8]

In response, Mr. Osborne asserts Syllabus Point 7 of *Horkulic* does not apply here because in that case, the consent judgment was for an amount triple the insurance policy's coverage limits, whereas here, the $1,000,000.00 consent judgment does not exceed the coverage limits in Penn-America's policy. However, Syllabus Point 7 of *Horkulic* does not contain a legal exception for consent judgments which do not exceed an insurance policy's coverage limits. Rather, our concern in *Horkulic* was the suspect nature of consent judgments, especially when coupled with a covenant not to

---

[8] Emphasis added.

execute, regardless of whether they exceed an insurance policy's coverage limits. As we explained:

> When dealing with consent judgments, courts must ensure that circumstantial guarantees of trustworthiness exist concerning the genuineness of the underlying judgment. The real concern is that the settlement may not actually represent an arm's length determination of the worth of the plaintiff's claim. When the insured actually pays for the settlement of the claim or when the case is fully litigated, the amount of the settlement or judgment can be assumed to be realistic. However, the settlement amount in a consent judgment with a covenant not to execute is more suspect.[9]

This case perfectly illustrates our concern with the suspect nature of consent judgments. None of the parties to the pre-trial settlement agreement had any motive to contest liability or an excessive amount of damages. Likewise, they agreed to value Mr. Osborne's claim for an injured leg at $1,000,000.00, despite citing no evidence supporting that figure. When Penn-America tried to conduct discovery on this issue, it was met with resistance by Mr. Osborne, and the circuit court prohibited it from doing discovery on the extent of Mr. Osborne's injuries and damages.

Most importantly, Penn-America was not a party to the lawsuit in which the consent judgment was entered. Therefore, our law is clear the consent judgment is not binding on Penn-America. The circuit court should have granted summary judgment to Penn-America.

---

[9] *Horkulic*, 222 W.Va. at 460-61, 665 S.E.2d at 294-95, *quoting Ross v. Old Repub. Ins. Co.*, 134 P.3d 505 (Colo. App. 2006).

10

### B. The Assignment of Allegheny and Heartwood's Claims to Mr. Osborne is Void.

Next, we examine the pre-trial assignment to Mr. Osborne of claims that Allegheny and Heartwood may have had against Penn-America. Mr. Osborne's assigned claims are based on the following stipulated facts, as laid out in the pre-trial settlement agreement: (1) Penn-America breached its insurance contract by failing to "provide a defense or insurance coverage related to Osborne's claims against Allegheny and Heartwood;" (2) Because of the breach, Allegheny and Heartwood suffered damages because they were "compelled to expend funds and other resources in the defense of this action;" and (3) "Allegheny and Heartwood have been compelled to mitigate the claims asserted by Osborne by [entering into a pre-trial settlement agreement] with Osborne to preserve and protect the assets of Allegheny and Heartwood." Conspicuously absent from the pre-trial settlement agreement is any mention of the fact that Allegheny and Heartwood *were* being defended and *were* provided with coverage in Mr. Osborne's lawsuit by Liberty Mutual Insurance.

Penn-America contends the stipulated facts in the pre-trial settlement agreement are largely untrue. For example, Allegheny and Heartwood's defense in Mr. Osborne's lawsuit was not self-funded, but rather, it was provided by Liberty Mutual Insurance. Because Liberty Mutual Insurance was already providing Allegheny and Heartwood with insurance coverage and a defense, the pre-trial settlement agreement was not necessary to protect their assets. Penn-America argues that, when considered in light of the covenant not to execute, the pre-trial assignment was clearly an avenue for getting Allegheny and Heartwood (and their insurer, Liberty Mutual Insurance) dismissed from

11

the lawsuit and transferring liability for the $1,000,000.00 consent judgment to a non-party.

Accordingly, Penn-America asserts Mr. Osborne's recovery on his assigned claims would be based on false factual bases. Therefore, the assignment is void, and the circuit court should have granted Penn-America summary judgment on all the claims asserted against it.

In response, Mr. Osborne argues that assignments of bad faith claims coupled with a covenant not to execute are clearly permissible under the law of West Virginia. By making this argument, Mr. Osborne grossly oversimplifies West Virginia law, and he fails to cite to a single case, in any jurisdiction, containing a blanket rule that all assignments coupled with a covenant not to execute are valid as a matter of course.

By contrast, as Justice Davis has observed, "whether an assignment and covenant not to execute is valid must be resolved on the particular facts presented."[10] "That is, all jurisdictions addressing the issue appear to permit an assignment and covenant not to execute in some circumstances but deny it in others."[11] Indeed, "judicial opinions [addressing assignments and covenants not to execute] are so fact-specific, that sweeping generalizations are difficult."[12]

---

[10] *Strahin v. Sullivan*, 220 W.Va. 329, 341, 647 S.E.2d 765, 777 (2007) (Davis, J., Concurring).

[11] *Id.*, 220 W.Va. at 358, 647 S.E.2d at 794 (Davis, J., Concurring).

[12] Justin A. Harris, *Judicial Approaches to Stipulated Judgments, Assignment of Rights, and Covenants Not to Execute in Insurance Litigation*, 47 Drake L. Rev. 853, 860 (1999).

Nevertheless, there is one common thread which ties cases addressing pre-trial assignments and covenants not to execute together: they recognize that this arrangement entails a great risk of fraud and collusion.[13]  As it has been noted: "almost every case involving [pre-trial assignments and covenants not to execute] contains at least some mention of the potential for fraud and collusion, regardless of whether the final decision favors the plaintiff or carrier."[14]  This common problem has been summarized as follows:

> If the assignment and covenant not to execute are exchanged before judgment, there is no incentive for either party to engage in the kind of adversarial process which normally ensures that a settlement or judgment accurately reflects the value of the case.  The plaintiff will always strive for a judgment admitting liability and a large amount of damages.  The usual check in this situation is the position of the insured, who has his own incentive to minimize loss.  But since the [assignment and] covenant not to execute relieves

---

[13] *See, e.g., State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696, 705 (Tex. 1996) ("Allowing an assignee of the named judgment debtor in such a case to collect all or part of the judgment amount perpetrates a fraud on the court, because it bases the recovery on an untruth, i.e., that the judgment debtor may have to pay the judgment."); *Pryun v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 518, 42 Cal. Rptr. 2d. 295, 305 (1995) ("To be sure, [an assigned] stipulated or consent judgment which is coupled with a covenant not to execute against the insured brings with it a high potential for fraud or collusion."); *Freeman v. Schmidt Real Estate & Ins. Co.*, 755 F.2d 135, 139 (8th Cir. 1985) ("The issue, therefore, is whether the additional procedure of prejudgment assignment in return for a promise not to execute also should be available. . . . [C]ollusion . . . would be possible anytime the insured were protected by an agreement not to execute prior to entry of judgment; the insured thus loses the incentive to contest his liability or the extent of the injured party's damages."); *Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d 589, 592 (Fla. Dist. Ct. App. 1984) (suspicion of collusion and fraud led court to deny effect to settlement and assignment).

[14] Chris Wood, *Assignments of Rights and Covenants Not to Execute in Insurance Litigation*, 75 Tex. L. Rev. 1373, 1386 (1997).

the insured of personal liability, his only incentive is to agree to whatever terms will persuade the plaintiff to abandon his suit.[15]

Compounding this problem is the fact that when the original plaintiff files his/her assigned bad faith claim against the insurer, the insurer may be saddled with the unenviable task of contesting the assigned claim's stipulated value and underlying factual bases without the insured defendant's participation.[16]

Likewise, in our sole case addressing the validity of an assignment and covenant not to execute, *Strahin v. Sullivan*, 220 W.Va. 329, 647 S.E.2d 765 (2007), we found the assignment invalid based on our concern that it would spawn fraud and collusion, holding:

> In order for an insured or an assignee of an insured to recover the amount of a verdict in excess of the applicable insurance policy limits from an insurer pursuant to this Court's decision in *Shamblin v. Nationwide Mutual Ins. Co*., 183 W.Va. 585, 396 S.E.2d 766 (1990), the insured must actually be exposed to personal liability in excess of the policy limits at the time the excess verdict is rendered.[17]

Our holding in *Strahin* is limited to pre-trial assignments of claims against an insurer who, while providing its insured a defense in a lawsuit, fails to settle within its policy's coverage limits.

---

[15] *Id.* at 1385.

[16] *See Gandy*, 925 S.W.2d at 713 (describing how assignments coupled with a consent judgment and covenant not to execute function).

[17] Syl. Pt. 9, *Strahin*, 220 W.Va. at 337, 647 S.E.2d at 773.

However, our rationale in *Strahin* extends beyond the limited facts of that case and is simply this: recovery on an assigned insurance bad faith claim may not be made upon an untrue factual basis. For the *Strahin* plaintiff to recover on his assigned claim against the insurer for failing to settle a lawsuit against its insured, he had to prove the insured was damaged because his assets were at risk of being levied to satisfy an excess verdict.[18] As we noted, the *Strahin* insured "was not personally liable for the excess verdict at the time it was rendered. . . . [His] personal assets were already protected by the Covenant [not to execute]."[19] Thus, we concluded that under the facts of the case, where recovery on the assigned claim would be based on a falsehood – *i.e.*, that the insurer's breach caused its insured damages he did not suffer – the assignment was void as a matter of public policy.[20] In this regard, we stated, "holding an insurer liable for a judgment even when the insured is not legally liable for the same only encourages collusion between the insured and the plaintiff to raid the insurance proceeds."[21]

---

[18] *Id.*, 220 W.Va. at 335, 647 S.E.2d at 771 ("Accordingly, to recover under *Shamblin*, there must not only be a negligent refusal to accept a settlement offer by the insurer, but also subsequent harm to the insured. In other words, the insured's personal assets must be at risk.").

[19] *Id.*, 220 W.Va. at 335, 647 S.E.2d at 771.

[20] *Id.*, 220 W.Va. at 337, 647 S.E.2d at 773.

[21] *Id.* *Strahin* did not invalidate every assignment of a bad faith insurance claim which is coupled with a covenant not to execute. *See Id*, 220 W.Va. at 342, 647 S.E.2d at 778 (Davis, J., Concurring) (explaining an assignment and covenant not to execute may be agreed to in a variety of situations).

15

Our rationale in *Strahin* applies squarely to this case. Mr. Osborne's recovery on the assigned claims would be based on a falsehood, *i.e.*, that due to Penn-America's breach, Allegheny and Heartwood were without insurance coverage, and the $1,000,000.00 consent judgment was necessary to protect their assets. At all times herein, Allegheny and Heartwood were provided insurance coverage and a defense by Liberty Mutual Insurance. Further, there was no evidence Allegheny and Heartwood asked Penn-America for coverage.

Moreover, we note another falsehood contained in the pre-trial settlement agreement: that Allegheny and Heartwood filed a third-party complaint for declaratory relief on the Penn-America policy. Even though Allegheny and Heartwood filed a motion seeking permission to file a third-party complaint seeking declaratory relief, they never followed through by bringing the motion on for a hearing. Had Allegheny and Heartwood been more diligent in seeking declaratory relief, such as filing an independent suit for declaratory relief against Penn-America, coverage issues could have been determined before liability under Penn-America's policy.[22] Likewise, Mr. Osborne was entitled to seek the same relief.[23] Instead, Allegheny, Heartwood, and Mr. Osborne

---

[22] As noted in *Gandy*, "when issues of coverage and the duty to defend arise, it is not unusual for [the insurer], or the [defendant] or both to attempt to adjudicate them before [the plaintiff's] claim is adjudicated. . . . Determining an insurer's obligations before its insured incurs liability benefits both the insurer and the insured by removing that uncertainty." *Gandy*, 925 S.W.2d at 714.

[23] *See* Syl. Pt. 3, *Christian v. Sizemore*, 181 W.Va. 628, 383 S.E.2d 810 (1989), in which we held:

16

sought to bind a non-party to pay Mr. Osborne $1,000,000.00 for an injured leg while it was prohibited from contesting the lawsuit's reasonable value or stipulated facts.

Finally, we note that the following symptoms of fraud and collusion are present in this case:

> Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer. They have in common unfairness to the insurer, which is probably the bottom line in cases in which collusion is found.[24]

As we previously discussed, the facts underlying Mr. Osborne's assigned claims were misrepresented. Moreover, a $1,000,000.00 valuation of a lawsuit for an injured leg, without any cited evidence regarding permanency of the injury, permanent disability, severity, medical expenses, etc., hardly reflects a "serious negotiation on damages." Lastly, concealment also characterizes the pre-trial settlement agreement because the parties never notified Penn-America of their pre-trial settlement negotiations. Once Penn-America learned after-the-fact of the pre-trial assignment and covenant not to execute, it was prohibited from conducting discovery on the extent of Mr. Osborne's

---

> An injured plaintiff may bring a declaratory judgment action against the defendant's insurance carrier to determine if there is policy coverage before obtaining a judgment against the defendant in the personal injury action where the defendant's insurer has denied coverage.

[24] *Continental Cas. Co. v. Westerfield*, 961 F. Supp. 1502, 1505 (D.N.M. 1997), *quoting* Stephen R. Schmit, *The Bad Faith Setup*, 29 Tort & Ins. L. Rev. 705, 727-28 (1994).

injuries and damages. Thus, through secretive means, Allegheny and Heartwood awarded Mr. Osborne a $1,000,000.00 windfall for his injured leg with Penn-America's money. Accordingly, under the facts of this case, we find the assignment of Allegheny and Heartwood's claims to Mr. Osborne void, and the circuit court erred in failing to grant Penn-America summary judgment.[25]

## IV.
## CONCLUSION

We find that the pre-trial settlement agreement between Mr. Osborne, Allegheny, and Heartwood is not enforceable against Penn-America, a non-participating party. The consent judgment is not binding on Penn-America because it was not a party to the lawsuit in which the consent judgment was entered. Moreover, under the particular facts of this case, the assignment by Allegheny and Heartwood of any claims they may have had against Penn-America to Mr. Osborne is void. Thus, the circuit court should have granted summary judgment for Penn-America, not Mr. Osborne. Accordingly, we reverse the circuit court's December 19, 2014, order, and we direct the circuit court to dismiss Penn-America from Mr. Osborne's lawsuit with prejudice.

Reversed and Remanded.

---

[25] We decline to address the remaining part of the settlement agreement, *i.e.*, the covenant not to execute, because that part of the settlement agreement was not a part of this appeal, and it did not purport to bind Penn-America. Moreover, the settlement agreement provides that the parties agreed to "expressly undertake and assume the risk that the settlement underlying the execution of this agreement was made on a . . . misunderstanding of the law . . . and that it may result in a legal right being lost against others not parties to this agreement."

18